NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

SOUAD ALFARTOUSI, *Appellant*.

No. 1 CA-CR 24-0543

FILED 07-22-2026

Appeal from the Superior Court in Maricopa County
No. CR2021-132151-004
The Honorable Joseph C. Kreamer, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Alice Jones
*Counsel for Appellee*

Zhivago Law, Phoenix
By Kerrie M. Droban Zhivago
*Counsel for Appellant*

**MEMORANDUM DECISION**

Presiding Judge Andrew M. Jacobs delivered the decision of the Court, in which Judge Brian Y. Furuya and Judge James B. Morse Jr. joined.

**J A C O B S**, Judge:

¶1        Souad Alfartousi appeals her conviction and probation for unlawful imprisonment, a class six undesignated felony.  *See* Ariz. Rev. Stat. ("A.R.S.") §§ 13-1303, -604.  Souad's counsel has filed a brief in accordance with *Anders v. California*, 386 U.S. 738 (1967), and *State v. Leon*, 104 Ariz. 297 (1969), stating counsel has searched the record on appeal and found no arguable question of law.  Counsel asks us to search the record for fundamental error.  *See State v. Clark*, 196 Ariz. 530, 537 ¶ 30 (App. 1999) (stating that we review the entire record for reversible error).  We allowed Souad to file a supplemental brief *in propria persona*, and she has done so, raising issues that we address.  Finding no reversible error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2        Souad is the mother in the Alfartousi family, which includes her husband, Fares, and five adult children, all of whom were raised in the Muslim religion.  The children include three brothers — Yaser, Bashir, and Ali — and two sisters — Zahraa and Z.A.,[1] who is the youngest child and a victim in this case.[2]  Having fled Iraq as refugees, the Alfartousi family immigrated to the United States shortly after Z.A.'s birth in 2001.

¶3        By 2018, Z.A. had met M.L., a non-Muslim.  They later began a romantic relationship, which Z.A. hid from her family, as she feared they would not accept her dating outside the Muslim faith.

¶4        In the summer of 2020, Z.A. became pregnant with M.L.'s child.  Zahraa learned of the pregnancy, and Z.A., fearing her family's reaction, falsely told Zahraa and the police that M.L. had sexually assaulted her.  Police arrested M.L., but after a brief investigation, Z.A. recanted, the charges were dropped, and Z.A. later served two days in jail for false reporting.  That first pregnancy resulted in a miscarriage.

¶5        In early March 2021, Z.A. left her family's home to live with M.L. and his mother ("E.A.").  Z.A. did not tell her family where she was

---

[1] We use initials to protect the victims' privacy.

[2] This Court has previously decided the appeals of Bashir, Zahraa, and Yaser.  *See State v. Alfartousi*, 1 CA-CR 24-0570, 2025 WL 2427184 (Ariz. App. Aug. 21, 2025) (mem. decision); *State v. Alfartousi*, 1 CA-CR 24-0624, 2025 WL 2453937 (Ariz. App. Aug. 26, 2025) (mem. decision); *State v. Alfartousi*, 1 CA-CR 24-0560, 2026 WL 279307 (Ariz. App. Feb. 3, 2026) (mem. decision).

going, however, out of concern her relationship with M.L. could result in an "honor killing." Only minutes after Z.A. left, the entire Alfartousi family began looking for her, tracked her down and confronted her in Peoria. Z.A. refused to come home with them, and after bystanders called the police, she was able to continue without further interference.

¶6        After Z.A. left home, she purchased eight cell phones between March and August 2021 to prevent her family from following her. And except for a brief text message exchange with a nephew, neither she nor M.L. initiated communications with the Alfartousi family, much less voluntarily disclosed their location. Z.A. and M.L. also relocated numerous times to various communities over the next several months. However, the Alfartousi family repeatedly covertly tracked, harassed, and confronted them to bring Z.A. back. To facilitate their surveillance and avoid detection, the family rented multiple automobiles between March and August 2021. As the family escalated its activities, police involvement became increasingly necessary.

¶7        Shortly after Z.A. left home, on March 5, 2021, Zahraa filed a missing person's report with the Peoria Police Department, alleging Z.A. had disappeared. Z.A. and M.L. learned of the report and contacted Glendale police officers, who conducted a welfare check and confirmed Z.A. was safe and had voluntarily chosen not to return home.

¶8        Z.A. and M.L. relocated to a Phoenix extended-stay hotel, but the family found them, and on March 6, Souad and Zahraa began banging on the couple's hotel door, attempting to coerce Z.A. to return home. Panicked, Z.A. hid in the bathroom and called the Phoenix police. When officers responded, Z.A. reiterated she did not want to return home, and after the officers explained her stance to Zahraa and Souad, they and the family members with them left.

¶9        The next day, March 7, Zahraa filed one of at least three petitions to have Z.A. committed to a mental health facility. Phoenix police officers came to the hotel and took Z.A. to a hospital for evaluation. When Z.A. was released the next day, the entire Alfartousi family was waiting outside the facility, so hospital staff helped Z.A. evade them. Another mental health petition was filed and served on March 8. That petition was quickly quashed.

¶10        Z.A. and M.L. abandoned their Phoenix hotel and secured other lodging for a few days before moving back in with E.A. The Alfartousi family had learned E.A.'s address, however, and several family

members — including Souad — began a campaign of harassment and intimidation there. Ring camera footage captured several incidents, including one in which Zahraa vandalized E.A.'s yard, smashing pots, screaming, and threatening to send Z.A. back to Iraq. This incident resulted in E.A. calling the police and generating a police report. Zahraa also called the Peoria police, claiming M.L. and E.A. were holding Z.A. against her will.

¶11        Z.A. and M.L. next checked into a motel in Glendale. The Alfartousi family reported Z.A. missing, and Glendale police conducted a welfare check at the motel. Feeling unsafe, the couple left the motel and again moved to an extended-stay hotel in Phoenix.

¶12        On March 17, Z.A. and M.L. left their hotel room to get dinner. As they drove out of the hotel parking lot and tried to turn left, Yaser's gold van blocked and nearly crashed into them, while other vehicles came toward them from behind. Z.A. saw her entire family there. Bashir exited the van holding what appeared to be a gun and tried to open Z.A.'s door. M.L. quickly drove over a curb and through some landscaping, damaging the couple's car, to get past the van and escape. The van and other vehicles chased them for several blocks, even as M.L. sped and ran multiple red lights. Eventually, Z.A. and M.L. lost their pursuers, stopped at a convenience store, and contacted the police.

¶13        Z.A. and M.L. moved to a hotel in Tempe, but the family soon found them. The couple then decided to relocate to Yuma. Before leaving, M.L. bought a gun for their protection.

¶14        On March 24, the morning after arriving in Yuma, the couple left their hotel room to get breakfast. Suddenly, Bashir, Fares, and Souad appeared and accosted Z.A. Bashir began dragging Z.A., who resisted and screamed, while Fares and Souad assisted Bashir in trying to force Z.A. into a white SUV. M.L. ran back into the hotel room, retrieved his gun, and pointed it at Bashir, ordering him to release Z.A. Bashir complied. M.L. kept his gun trained on Bashir, Fares, and Souad until Yuma police arrived.

¶15        Z.A. had previously sought an order of protection against Zahraa on March 9, and she sought further orders of protection against other members of the family after the Yuma incident.

¶16        Z.A. and M.L. returned to the Phoenix area and moved to a shelter in Goodyear for the next two to three months. They also obtained new phone numbers, but in late April 2021, Zahraa resumed the

harassment, serially calling M.L. and threatening to kidnap and harm his much younger minor siblings.

¶17　　　　On April 29, 2021, Ali also called M.L., leaving a profanity-laced message stating he knew where the members of M.L.'s family lived and threatening to kidnap M.L.'s sister and harm his entire family. Seeking protection for herself and her family, E.A. petitioned for and received injunctions against harassment against Zahraa and Ali.

¶18　　　　Meanwhile, Z.A. learned she was again pregnant. After exhausting their stay limit at the Goodyear shelter, and realizing the Alfartousi family had again found them, Z.A. and M.L. relocated to a veteran's home in Tonopah, Arizona.

¶19　　　　On June 30, 2021, a friend drove Z.A. and M.L. to a well-baby visit in Tolleson. After the appointment, as Z.A. and M.L. returned to the car, a gold van driven by Zahraa pulled up and blocked their car. Bashir exited the vehicle wearing a surgical mask and sprayed mace or pepper spray in the couple's eyes. Bashir also punched M.L. and broke his eyeglasses. Bashir and Zahraa then fled before Tolleson police officers arrived, and Z.A. and M.L. received help in the medical center.

¶20　　　　On August 18, 2021, Z.A. and M.L. traveled to Avondale for a prenatal appointment with a new obstetrician. As they walked from the parking lot to the doctor's office, five members of the Alfartousi family suddenly emerged from a black SUV and attacked them. Yaser and Fares restrained M.L., and Ali, Zahraa, and Souad pushed and dragged Z.A. approximately forty feet before forcing her into the SUV. During the assault, Ali repeatedly punched Z.A. in the stomach. People from the doctor's office heard Z.A. and M.L. screaming, called 911, and tried to assist Z.A. Z.A. managed to escape out the other side of the SUV, but she sustained numerous bruises and was taken to a hospital emergency room for treatment after police officers arrived.

¶21　　　　During the attack, Fares forcibly took Z.A.'s purse from M.L. The purse held the couple's cellphones, bank and identification cards, and gun. Although Fares returned the gun and the purse with some items in it after the police arrived, many other items were not recovered until the Peoria and Goodyear Police Departments executed a search warrant at three addresses linked to the Alfartousi family — the family's residence, Ali's residence, and Yaser's residence. During their search, police obtained evidence, including cell phone records, rental vehicle receipts and logs, and

surveillance footage, suggesting the Alfartousi family had been tracking Z.A. and M.L., despite the couple's frequent relocations to avoid contact.

¶22        The State obtained a grand jury indictment against Z.A.'s parents and siblings. The State charged Souad with kidnapping, a class two felony and domestic violence offense, and aggravated robbery, a class three felony, both allegedly committed during the August 18 attack, and two counts of stalking, each a class five felony and domestic violence offense, allegedly committed on or between March 1 and August 18, 2021, against Z.A. and M.L.

¶23        The defendants were tried together during a twenty-day trial. None of them, including Souad, chose to testify or present witnesses. The court denied Souad's Rule 20 motion for judgment of acquittal. *See* Ariz. R. Crim. P. 20(a)(1).

¶24        The jury found Souad not guilty of the aggravated robbery and stalking charges, and as to the kidnapping charge, the jury found her only guilty of the lesser-included offense of unlawful imprisonment, a class six felony, related to the August 18 incident, and further found she did not voluntarily release Z.A. without physical injury in a safe place. Although the State had alleged aggravating factors, it chose not to proceed with an aggravation phase.

¶25        At sentencing, the court considered as a mitigating factor the family's "incredible trauma" and also explained its concerns over Souad's mental illness issues. The court ordered Souad's conviction treated as an undesignated felony, *see* A.R.S. § 13-604, suspended her sentence, and placed her on three years' supervised probation, ordering her to abide by domestic violence and mental health terms. The court also ordered Souad to pay a monthly standard probation fee, *see* A.R.S. §§ 13-901(A), 31-467.06(A), and other assessments, and retained jurisdiction over restitution.

¶26        We have jurisdiction over Souad's timely appeal. Ariz. Const. art. 6, § 9; A.R.S. §§ 12-120.21(A)(1), 13-4031, -4033(A)(1), (4).

## DISCUSSION

### I.    Alleged Jury Bias

¶27        Souad claims "most of the jury worked in law enforcement" to argue the jury must have been biased against her. The record does not support her factual claim or that unsupported conclusion.

**¶28**         "A defendant is not entitled to be tried by any particular jury but only by one which is fair and impartial." *State v. Hilliard*, 89 Ariz. 129, 133 (1961); *see also Holland v. Illinois*, 493 U.S. 474, 480 (1990) (stating the Sixth Amendment entitles a defendant to an impartial jury but not necessarily a representative one); *State v. Taylor*, 112 Ariz. 68, 79 (1975) (recognizing a perfect jury panel "is not possible").  Bias or prejudice in favor of or against any party to an action disqualifies a person from serving as a juror in that action.  A.R.S. § 21-211(4).  However, we will not simply presume a juror is biased or prejudiced; instead, objective indications must support such a conclusion.  *State v. Tison*, 129 Ariz. 526, 535 (1981).

**¶29**         We have reviewed the entire record on appeal, including the jury selection transcript.  So far as the record reveals, no biased or prejudiced juror was impaneled, and no one was systematically excluded from the jury panel.  Souad shows no error, much less fundamental, reversible error.

## II.      Alleged Judicial Bias

**¶30**         Souad also argues the superior court judge was "racist," "unfair," and biased against her.  We generally presume that a trial judge is unbiased and free of prejudice.  *State v. Rossi*, 154 Ariz. 245, 247 (1987). To rebut that presumption, a defendant must show by a preponderance of the evidence that the judge was, in fact, biased or prejudiced.  *Id.*; *State v. Ramsey*, 211 Ariz. 529, 541 ¶ 38 (App. 2005).  Souad identifies nothing in the record to support her accusations, however, and after reviewing the entire record, we discern none.  The trial judge was patient, despite outbursts by Souad and Ali, and his careful reasoning supporting his rulings throughout the trial showed his commitment to impartiality.  *See State v. Carver*, 160 Ariz. 167, 173 (1989).  The record reflects nothing to suggest unfairness, bias, or that his impartiality could reasonably be questioned.  *See id.*  Because "[b]are allegations of bias and prejudice, unsupported by factual evidence, are insufficient to overcome the presumption of impartiality," *id.*, Souad has not shown any error, much less fundamental, reversible error.

## III.      Sufficiency of the Evidence

**¶31**         Souad also argues that she never kidnapped or hurt Z.A. and that she was merely "looking after her."  Her argument that she never kidnapped Z.A. does not advance her appeal, however, because the jury found her not guilty of kidnapping, and instead found her guilty of the lesser-included offense of unlawful imprisonment.  The remainder of her

argument appears to be a request for this court to reweigh the evidence and a challenge to the sufficiency of the evidence.

**¶32** "When reviewing the sufficiency of the evidence, an appellate court does not reweigh the evidence to decide if it would reach the same conclusions as the trier of fact." *State v. Guerra*, 161 Ariz. 289, 293 (1989) (citations omitted). We will affirm if "substantial evidence" supports the guilty verdict. *Id.* Substantial evidence is "[m]ore than a scintilla and is such proof as a reasonable mind would employ to support the conclusion reached." *Id.* (quoting *State v. Tison*, 129 Ariz. 546, 553 (1981)). Thus, when evaluating the sufficiency of the evidence, we simply test the evidence "against the statutorily required elements of the offense." *State v. Pena*, 209 Ariz. 503, 505 ¶ 8 (App. 2005).

**¶33** "A person commits unlawful imprisonment by knowingly restraining another person." A.R.S. § 13-1303(A). Nevertheless, it is a defense that "[t]he defendant is a relative of the person restrained and the defendant's sole intent is to assume lawful custody of that person and the restraint was accomplished without physical injury." A.R.S. § 13-1303(B)(2). Here, the record contains evidence that, during the August 18 incident in Avondale, Souad knowingly restrained Z.A. when she and other family members forced Z.A. into their SUV and, as a result of that attack, Z.A. suffered physical injury. Because substantial evidence supports the jury's findings of guilt for unlawful imprisonment and that Souad did not voluntarily release Z.A. "without physical injury in a safe place," we affirm Souad's conviction.

## IV. Prosecutor's Golden Rule Comment

**¶34** The record reveals one additional potential issue. During closing argument, referring to the victim, the prosecutor told the jury, "Put yourself in her shoes, ladies and gentlemen . . .." It is an error for a court to allow a party to "make arguments which appeal to the passions and fears of the jury." *See State v. Comer*, 165 Ariz. 413, 426 (1990); *see State v. Moody*, 208 Ariz. 424, 459 ¶ 149 (2004). A prosecutor may not invite jurors to place themselves in the victim's position because such "Golden Rule" arguments improperly appeal to the jurors' sympathy or emotions rather than their impartial consideration of the evidence. *See State v. Morris*, 215 Ariz. 324, 337 ¶ 58 (2007). Because Souad did not object, we review the comment only for fundamental error. *Id.* at 337 ¶ 59.

**¶35** Although the prosecutor's remark was improper, it consisted of a single, isolated statement during closing argument. *Id.* at 337-38 ¶¶ 58-

60 (holding a prosecutor's remark asking the "jurors to apply common sense" did not constitute fundamental, reversible error because it was an isolated comment and the defendant failed to establish prejudice). Moreover, the jury acquitted Souad of aggravated robbery and both stalking charges and found her guilty only of the lesser-included offense of unlawful imprisonment rather than kidnapping, demonstrating that it evaluated the evidence instead of deciding the case based on sympathy. On this record, the prosecutor's comment did not deprive Souad of a right essential to her defense, go to the foundation of the case, or otherwise render the trial fundamentally unfair. *See Moody*, 208 Ariz. at 460 ¶¶ 151-54 (holding an improper, inflammatory closing argument did not require reversal because it was an isolated comment that did not deny the defendant a fair trial). Accordingly, the prosecutor's comment does not constitute fundamental, reversible error.

## V.     Additional Considerations

**¶36**        After reviewing the entire record for reversible error, we find none. *See Leon*, 104 Ariz. at 300; *Clark*, 196 Ariz. at 537 ¶ 30. The evidence presented at trial was substantial and supports Souad's conviction and probation. So far as the record reveals, Souad was represented by counsel at all stages of the proceedings and had a chance to speak at sentencing. The sentence imposed was within statutory guidelines, and the proceedings complied with Souad's constitutional and statutory rights and the Arizona Rules of Criminal Procedure.

## CONCLUSION

**¶37**        For the foregoing reasons, we affirm. Upon the filing of this decision, defense counsel shall inform Souad of the status of her appeal and of her future options. Counsel has no further obligations unless, upon review, counsel finds an issue appropriate for submission to the Arizona Supreme Court by petition for review. *See State v. Shattuck*, 140 Ariz. 582, 584-85 (1984). Souad shall have thirty days from the date of this decision to proceed, if she desires, with a pro per motion for reconsideration or petition for review. *See* Ariz. R. Crim. P. 31.21(b)(2)(A).